# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| SHAW ENVIRONMENTAL, INC., | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No. CV-09-S-01100-NE** |
| vs. | ) | |
| | ) | |
| TELEDYNE BROWN ENGINEERING, INC., | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

This action is before the court on defendant's motion to dismiss plaintiff's complaint for failure to state a claim upon which relief can be granted (doc. no. 13). In support of its motion to dismiss, defendant attached the declaration of Renee Varner, Senior Contract Administrator for Teledyne Brown Engineering, Inc., as well as numerous other documents that are not referenced in plaintiff's complaint.[1] Finding that the attached evidence must be considered to resolve defendant's motion to dismiss, the court converted the motion to a Rule 56 motion for summary judgment.[2] The court entered an order allowing the parties to submit additional material in light of the conversion,[3] but plaintiff chose not to file any supplemental

---

[1] Doc. no. 13, Ex. 1-8.

[2] *See* doc. no. 42.

[3] *See id.*

briefing.  Defendant filed a brief reiterating the primary arguments raised in its original motion.[4]  Upon consideration, the motion for summary judgment will be granted for the following reasons.

## I.  RELEVANT LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).[5]  In other words, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment."  *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)).  Inferences in favor of the non-

---

[4] *See* Doc. no. 45.

[5] Rule 56 was recently amended in conjunction with a general overhaul of the Federal Rules of Civil Procedure.  The Advisory Committee was careful to note, however, that the changes "are intended to be *stylistic only*."  Adv. Comm. Notes to Fed. R. Civ. P. 56 (2007 Amends.) (emphasis supplied).  Consequently, cases interpreting the previous version of Rule 56 are equally applicable to the revised version.

moving party are not unqualified, however.  "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation."  *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983).  Moreover,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is *material* to an issue affecting the outcome of the case.  The relevant rules of substantive law dictate the materiality of a disputed fact.  A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (emphasis supplied).

*See also Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 251-52 (1986) (asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

## II.  SUMMARY OF THE FACTS

Plaintiff Shaw Environmental, Inc. ("Shaw"), is a corporation existing under the laws of the State of Louisiana with its principal place of business located in Baton Rouge, Louisiana.[6]  Defendant Teledyne Brown Engineering, Inc. ("TBE"), is a corporation existing under the laws of the State of Delaware with its principal place of business located in Huntsville, Alabama.[7]  On September 26, 2005, Shaw, as a

---

[6] *See* doc. no. 1, ¶ 1.

[7] *See id.*, ¶ 2.

prime contractor, entered into contract number W911RP-05-C-0032 ("the prime contract") with the United States Army, Pine Bluff Contracting Division, for the modernization of the white phosphorus munitions facility at the Army's Pine Bluff Arsenal.[8]   The prime contract was to be performed in strict compliance with specification number AMSCM-OPPB-ETS-2005-02.[9]   In August of 2005, TBE submitted to Shaw a firm proposal to perform work as a subcontractor to Shaw under Shaw's prime contract.[10]   In December of the same year, Shaw, as prime contractor, and TBE, as subcontractor, entered into subcontract number 126555 ("the subcontract") in support of the prime contract.[11]   TBE's scope of work under the subcontract included provision of technological know-how, labor, materials, equipment, management, and transportation associated with design, fabrication, testing, delivery, installation, and quality assurance of components and systems for the project, including the "Munition Fill System."[12]   TBE's target completion date for work related to the Munition Fill System was November 9, 2006.[13]

When TBE originally submitted its subcontract proposal to Shaw, TBE offered

---

[8] *See id.*, ¶ 5.

[9] *See id.*, ¶ 7.

[10] *See* doc. no. 13, Ex. 2 (Declaration of Renee H. Varner), ¶ 4.

[11] *See* doc. no. 1, ¶ 8.

[12] *See id.*, ¶ 11.

[13] *See id.*, ¶ 12

to perform the work for the fixed price of $13,638,229, excluding options.[14]

However, TBE and Shaw subsequently agreed, with one exception not relevant to the

complaint in this case,[15] that TBE would *not* perform for a fixed price; instead, the

parties entered into a "cost-reimbursable subcontract."[16]    Cost-reimbursement

contracts compensate contractors based on the actual costs of their performance,

rather than upon the basis of an agreed fixed-price.[17] In a cost-reimbursement

contract, the contractor has no obligation to proceed, and bears no liability for not

proceeding, unless there is sufficient money available under the terms of the contract

to pay the contractor (or, in this case, the subcontractor) the estimated cost of

performing the work.  This point is expressly stated in the subcontract through the

Federal Acquisition Regulation "Limitation of Cost" clause, FAR 52.232-20 (48

C.F.R. § 52.232-20), a provision that is required to be included in all fully-funded

cost-reimbursement contracts.  Specifically, the clause states

> The Contractor [TBE] is not obligated to continue performance under
> this contract (including actions under the Termination clause of this
> contract) or otherwise incur costs in excess of the estimated cost
> specified in the schedule, until the Contracting Officer [Shaw] (i)
> notifies the Contractor in writing that the estimated cost has been

---

[14] *See* doc. no. 13, Ex. 2 (Declaration of Renee H. Varner), ¶ 4.

[15] The exception was that work for the later procured M156 munition would be performed at a fixed price, initially fixed at $312,390, and later reduced to $304,890. *See id.* at ¶ 5.

[16] *See id.*, ¶ 5.

[17] See Declaration of Renee Varner, ¶ 13.

increased and (ii) provides a revised estimated total cost of performing this contract.[18]

The clause further provides that

> The Contractor [TBE] shall notify the Contracting Officer [Shaw] in writing whenever it has reason to believe that — (1) the costs the contractor expects to incur under this contract in the next 60 days, when added to all costs previously incurred, will exceed 75 percent of the estimated cost specified in the Schedule; or (2) The total cost of performance of this contract, exclusive of any fee, will be either greater or substantially less than had been previously estimated.[19]

In light of these provisions in the Limitation of Cost clause of the subcontract, Renee Varner, the Senior Contract Administrator at TBE, alleges that she periodically notified Shaw when TBE was running out of funding to pay for the costs of TBE's scope of work under the subcontract.[20]  In a declaration prepared for this case, she explained that, for example, on June 15, 2006, she notified Shaw that TBE would exceed seventy-five  percent of the cost of the contract within the following sixty days.[21]  Similarly, she alleges that she periodically informed Shaw that, because the subcontract was cost-reimbursable, additional funding was necessary for any work that would result in costs above the funding available to pay TBE's costs on the

---

[18] Limitation of Cost, 48 C.F.R. § 52.232-20 ("Federal Acquisition Regulation" or "FAR 52.232-20); s*ee* Declaration of Renee Varner, Ex. 3 (Section XVI of Subcontract), Ex. 5 (Change Order Number 3).

[19] FAR 52.232-20(b).

[20] S*ee* Declaration of Renee Varner, ¶ 19.

[21] *See id.*

subcontract.[22]

On March 9, 2007, Ms. Varner again provided notice to Shaw that TBE expected to exceed the cost ceiling in completing work under the subcontract.[23] Several days later, on March 14, 2007, she wrote to Shaw that "because of the Limitation of Cost Clause in the contract, TBE is requesting assurance from Shaw, in writing, that you are committed to cover this cost overrun in excess of our current contract ceiling in order to avoid work interruption and complete this project."[24]  The next day, on March 15, 2007, she wrote to Shaw that "due to the Limitation of Cost clause in our contract, without written authorization or commitment from SHAW, TBE is unable to incur additional costs beyond our contract ceiling and funding."[25] In response, Shaw issued a "Subcontract Change Order" to increase the subcontract funding by $375,202.[26]

Several times throughout the performance of the subcontract, when money was running out on the contract to cover TBE's costs of performance, Shaw increased the amount of funding by issuing subcontract change orders.[27]  The issue of funding on

---

[22] *See id.*, ¶ 20.

[23] *See id.*.

[24] *Id.*, ¶ 20; *see* Declaration of Renee Varner, Ex. 8, at 1.

[25] *Id.*

[26] *See id.*, ¶ 21; *see* Declaration of Renee Varner, Ex. 9 (Change Order Number 8).

[27] *See id.*, ¶ 22; *see* Declaration of Renee Varner, Ex. 10 (Change Order Numbers 4, 6-9, 11, 14-16, 18).

the subcontract became more acute toward the end of 2007, when only relatively small amounts were added to the contract by Shaw.[28]   On December 20, 2007, Ms. Varner allegedly informed Shaw that TBE had no funding to proceed with any efforts under the contract as requested by Shaw.[29]   On December 27, 2007, Shaw issued "Subcontract Change Order Number 14," which added $10,000 to the subcontract, but these additional funds were added  specifically to cover TBE's costs to "send a representative to Pine Bluff Arsenal, Arkansas to assess the condition of the fill machine to determine what fixes/adjustments need to be made to the fill machine to complete start-up as well as provide estimated costs and schedule to implement those recommendations."[30]

The commissioning and troubleshooting process for the Munition Fill System allegedly began in January of 2008 under the direction and supervision of Walter Maxwell, a TBE designer and test engineer.[31]   According to Shaw's complaint, that process allegedly revealed various defects in the design and operation of the Munition Fill System.[32]   Shaw alleges that, in the months that followed, TBE identified and

---

[28] *See* Declaration of Renee Varner, ¶ 23.

[29] *See id.*

[30]*Id.*, ¶ 24; Declaration of Renee Varner, Ex. 12 (Change Orders Number 4, 6-9, 11, 14-16, 18).

[31] *See* doc. no. 1, ¶ 14.

[32] *See id.*, ¶ 15.

attempted to remedy several design flaws in an effort to bring the system into compliance with the specifications.[33]

On January 14, 2008, Shaw issued "Subcontract Change Order Number 15," which added $20,000 to the amounts available to pay TBE under the terms of the subcontract.[34]   This modification also extended the period of performance through March 31, 2008.[35]   On the same day, Ms. Varner notified Shaw that TBE was requesting additional funds, in the amount of $62,000, to continue work on the subcontract:   specifically, to provide specified engineering and manufacturing support.[36]   In response to that request, Shaw issued "Subcontract Change Order Number 16" on January 25, 2008, which added $62,000 to the subcontract to cover TBE's additional costs.[37]

On March 5, 2008, Ms. Varner again notified Shaw that TBE required additional funds in the amount of $60,000 to continue work on the subcontract, specifically to provide specified engineering and manufacturing support.[38]   In response to that request, Shaw issued "Subcontract Change Order Number 18" on

---

[33] *See id.*, ¶ 16.

[34] *See* Declaration of Renee Varner, ¶ 25; Ex. 13 (Change Order Number 15).

[35] *See id.*

[36] *See id.*, ¶ 26; Ex. 14.

[37] *See id.*, ¶ 27; Ex. 15 (Change Order Number 16).

[38] *See id.*, ¶ 28; Ex. 16.

March 17, 2008, which added $60,000 to the subcontract to cover to TBE's additional costs.[39] That was the last addition by Shaw of any funding to the subcontract.[40] Shaw did extend the period for performance of the subcontract on March 17, 2008, however, giving TBE until May 31, 2008 to complete its tasks.[41] That was the last extension of the subcontract's period of performance.[42]

By April 3, 2008, TBE allegedly was out of money to cover its costs, and Ms. Varner notified Shaw that day that TBE required additional funds, in the amount of $60,000, to continue work under the subcontract.[43] Shaw, however, did not issue any change order or take any other action to add additional funds to the subcontract to cover TBE's costs.[44] As a result, TBE terminated work on the project.

On April 21, 2008, Shaw's Program Manager, Jeff Bettinger, asked TBE for information about the temperature limitations on certain equipment.[45] On the same day, TBE reminded Shaw that TBE "was out of money on the contract," and that it "need[ed] additional funding prior to initiating any further actions."[46] Shaw did not

---

[39] *See id.*, ¶ 29; Ex. 17 (Charge Order Number 18).

[40] *See* Declaration of Renee Varner, ¶ 29.

[41] *See id.*, ¶ 30; Ex. 18 (Charge Order Number 19).

[42] *See id.*, ¶ 30.

[43] *See id.*, ¶ 31; Ex. 19.

[44] *See id.*, ¶ 32.

[45] *See id.*, ¶ 33.

[46] *See* Declaration of Renee Varner, ¶ 33; Ex.20.        .

add any funding to the subcontract at that time, or at any time thereafter.[47]  Moreover, Shaw did not extend the period of performance of the subcontract beyond May 31, 2008.

On July 23, 2008, Shaw informed Ms. Varner by means of a letter that it was entitled to $968,834, claiming that "TBE has been on notice of the nonconforming heaters since at least April 3, 2008."[48]  According to Ms. Varner, however, prior to receipt of that letter, she never received any notification about the issue.[49]  Moreover, as of April 3, 2008, there had been no funding on the contract.[50]  She contends, therefore, that under the terms of the subcontract, TBE had no duty to engage in any further activity.[51]

Upon the termination of TBE's performance on the project, Shaw allegedly incurred additional expenses to make the Munition Fill System operational by completing TBE's work on the project in four areas:  (1) the fill machine heater; (2) the volume chamber; (3) the load cell; and (4) the aspirate funnel.[52]  Shaw brings this action against TBE seeking damages for breach of contract as to all four of these

---

[47] *See id.*, ¶ 33. .

[48] Declaration of Renee Varner, Ex.21.

[49] *See* Declaration of Renee Varner, ¶ 37.

[50] *See id.*

[51] *See id.*

[52] *See* doc. no. 1, ¶ 22.

areas in Counts I through IV of the complaint.[53]  In Count V of the complaint, Shaw brings an additional breach of contract claim as to design and testing, alleging that in designing and testing components and systems, including the Munition Fill System, TBE failed to perform its duties properly.[54]

### III.  DISCUSSION

**A.    Choice of Law**

Shaw Environmental, Inc., issued the subcontract that is subject of this action under its prime contract with the United States Department of the Army.  As a result, the government subcontract incorporates by reference various contract clauses specified in the Federal Acquisition Regulation ("FAR"), 48 C.F.R. Parts 1-53.  The FAR establishes requirements and obligations between the government and its contractors and subcontractors that are unique to federal contracting.  With regard to the applicability of the FAR, the subcontract provides, in pertinent part, that :

> The Prime Contract named above is subject to all of the rules and regulations of the FAR and its Supplements.  *Section I lists the FAR clauses that are specifically cited in the Prime Contract.*  Section I may or may not contain all of the clauses that the United States Congress has mandated to be incorporated into Prime Contracts and any resulting Subcontracts.  *Any FAR clause that is mandated by law is hereby incorporated into this Agreement regardless of its lack of listing in*

---

[53] *See id.*, ¶¶ 24-41.

[54] *See id.*, ¶¶ 42-47.

*Section I.*[55]

As referenced in the foregoing provision, various FAR clauses are required to be included in Shaw's subcontract with TBE.  This incorporation occurs through a process known as "flow-down" of the clauses.[56]   Section I of the subcontract identifies the clauses descended from Shaw's prime contract with the Army to TBE's subcontract.[57]   The "flow-down" is accomplished by substituting the word "Subcontractor" (TBE) for the word "Contractor" in the applicable FAR clauses, and substituting "Contractor" for "Government" and "Contracting Officer."  This portion of the subcontract states:

> Flow-down clauses from Prime Contract Section I.   The Subcontractor shall have the rights, privileges, duties and obligations of the "contractor," and the Contractor shall have the rights, privileges, duties and obligations of the "Government" and "contracting officer" under the following provisions of the Federal Acquisition Regulation (FAR) and the DoD FAR Supplement ("DFARS") and local clauses identified below, with such modification as are set forth below.[58]

Counts I through IV of Shaw's Complaint depend upon TBE's alleged failure to comply with its obligation to remedy defects under paragraph (g) of the subcontract's Inspection Clause, FAR 52.246-3 "Inspection of Supplies - Cost

---

[55] Doc. no. 1, Ex. A (Subcontract), at 4.

[56] *See id.* at 55.

[57] *See id.*

[58] *Id.*

Reimbursement," which is referenced in the complaint as Section E.1(g) of the subcontract.[59]  Shaw argues that the subcontract, including the Inspection Clause cited in Counts I through IV of the complaint, is governed by, and should be interpreted pursuant to, the laws of the State of Louisiana rather than federal common law.[60]  In support of this argument, Shaw cites the following clause contained in the subcontract:

> IX.   APPLICABLE LAW and SEVERABILITY:  The laws of the State of Louisiana shall govern this Subcontract Agreement.  The performance of this work shall be in full compliance with the laws of the United States of America, the State of Louisiana and the state in which the Work is performed.[61]

In light of this clause, Shaw argues that TBE's efforts should be "scrutinized under the standards by which all cost-reimbursable contracts performed under Louisiana law are measured."[62]  Shaw further contends that the fact that the parties chose to incorporate FAR clauses by reference does not change the analysis or outcome.[63]  Shaw argues that it "has simply used some of the language in the FAR's limitation of cost clause in this commercial subcontract, which was specifically tailored to meet

---

[59] *See* doc. no. 1.

[60] *See* doc. no. 18 (Memorandum in Opposition to Defendant's Motion to Dismiss), at 7-15.

[61] Doc. no. 1, Ex. A, at 3-4.

[62] Doc. no. 18, at 13.

[63] *See id.*

14

its needs, for convenience . . . ."[64]   Consistent with its argument that Louisiana law should govern, Shaw entirely disregards the FAR clause cited in its own complaint as the basis for recovery and, instead, relies on a decision from the State of Louisiana, *Kerner v. Gilt*, 296 So. 2d 428 (La. App. 4 Cir. 1974),  to provide "the standard by which TBE's work will be judged under Louisiana law."[65]   This court is not persuaded by Shaw's choice of waw analysis.

The parties did not, as Shaw alleges, simply use some of the language in the FAR's Limitation of Cost clause for convenience.  The Limitation of Cost clause was one of many FAR clauses incorporated into the subcontract by full text or by reference.  Paragraph XVI of the subcontract incorporates the entire federal clause (FAR 52.232-20) by reference, and makes revisions only to tailor the clause to its subcontract.[66]   Later, in Change Order Number 3, the Limitation of Cost clause was again incorporated by reference with no revisions made.[67]   The clause was incorporated in whole and the protections that it afforded to both parties remain in full effect.

Defendant, TBE, does not, as Shaw alleges, argue that the court must apply

---

[64] *Id.* at 14.

[65] *Id.* at 15.

[66] *See* doc. no. 1, at 5.

[67] *See* Declaration of Renee Varner, Ex. 5 (Change Order No. 3).

federal common law to interpret any of the clauses of the subcontract.  Instead, TBE argues, and the court agrees, that the meaning and protections of the FAR clauses incorporated into the subcontract are plain on their face.[68]  Furthermore, the FAR clause that Shaw has plead in its complaint has an established meaning under federal procurement and regulatory law.  The decisions and analysis of the FAR clause cited by TBE in support of its motion are not "federal common law," but federal procurement regulatory law.  FAR clauses implement federal regulations and have the force and effect of law.  *See, e.g., DynCorp Information Systems, LLC. v. United States*, 58 Fed. Cl. 446, 451 (2003); *Dingle v. Halliburton Co.*, No. H-05-3719, 2006 WL 279286, at *2 (S.D. Tex. Sept. 25, 2006) (noting that specialized courts, including the Court of Federal Claims and Board of Contract Appeals, had "developed an extensive body of law interpreting the FAR and its predecessors" and, therefore, "decisions issued by state courts or restatements of law are rarely the most persuasive or authoritative sources for valid interpretations of contracts with agencies of the federal government").  This court accordingly finds that the FAR clause incorporated into the subcontract that provides the basis for Shaw's claims is governed by, and will be interpreted based upon, its plain meaning and pursuant to federal procurement regulatory law.

---

[68] *See* doc. no. 25, at 9.

## B.     Federal Cost-reimbursement Contract

The subcontract at issue in this case differs from the prime contract in that it is a cost-reimbursement contract, whereas the prime contract is for a firm fixed price. With regard to this distinction, the subcontract states: "Some of these clauses, by their nature, apply only to Contracts definitized on a firm fixed price ('FFP') basis, and others, by their nature, only apply to Contracts definitized on a cost-reimbursable ('CR') basis."[69]  This point is emphasized in Section I of the subcontract, where it states: "PRIME CONTRACT FLOWDOWNS SHALL APPLY, TO THE EXTENT APPLICABLE TO SUBCONTRACTOR'S WORK, AND APPROPRIATE FOR A COST REIMBURSABLE TYPE U.S. GOVERNMENT PRIME CONTRACT."[70]

A federal cost-reimbursement contract, such as the subcontract at issue here, allocates risk between the contracting parties in a way that is significantly different from fixed-price contracts.  In a fixed price contract, a buyer and seller agree on an end item or result that the seller will deliver for a set amount of money.  The parties agree that compensation for the seller is determined by the agreed-upon price, and not by the cost of performance.  In a fixed-price contract, delivery of anything less than the agreed upon item fails to satisfy the terms of the contract.

---

[69] Doc. no. 1, at 55.

[70] *Id.*

17

Cost-reimbursement contracts, on the other, compensate contractors based on the cost of performance.  Under this class of contract, the buyer does not purchase an end result; rather, the government — or in this case, Shaw — and the contractor or subcontractor agree that the contractor will exert its best efforts to reach the end result.  *See General Dynamics Corp. v. United States*, 671 F.2d 474, 480 (1982) ("[U]nlike a fixed price contract, under which the contractor is obligated to deliver the material or service for the stated price, a cost-reimbursement contract merely requires the contractor to use its best efforts to provide the goods or services at the stated price.").

In a cost-reimbursement contract, the contractor has no obligation to proceed, and bears no liability for not proceeding, *unless* there is sufficient money on the contract.  This point is expressly stated in the subcontract through FAR's Limitation of Cost clause, FAR 52.232-20 (48 C.F.R. § 52.232-20), which is required to be included in all fully-funded cost-reimbursement contracts.  *See* FAR 32.705-2(a).  As explained in Section III(A), *supra*, the Limitation of Cost clause was originally incorporated with modifications into Section XVI of the Subcontract.  Subsequently, Shaw incorporated the unmodified clause from the FAR into the subcontract through Change Order 003.  The clause states in pertinent part:

> The Contractor [TBE] is not obligated to continue performance

18

under this contract (including actions under the Termination clause of this contract) or otherwise incur costs in excess of the estimated cost specified in the schedule, until the Contracting Officer [Shaw] (i) notifies the Contractor in writing that the estimated cost has been increased, and (ii) provides a revised estimated total cost of performing this contract.[71]

In describing the Limitation of Cost clause, the leading treatise on government contracts explains: "This clause overrides all of the contract requirements by providing that[,] when the contractor has fully expended the funds included in the contract, there is no further obligation to continue performance or incur costs." John Cibinic, Jr. & Ralph C. Nash, *Formation of Government Contracts* 1105 (1998). Therefore, in a cost-reimbursement contract such as the subcontract at issue here, the contractor's primary obligation is not to complete the contract, but to work until the funds allotted to the contract have been expended.

The duty of a contractor under a cost-reimbursement contract is to provide its best efforts within the available funds. The Limitation of Cost clause expressly states: "The contractor agrees to use its best efforts to perform the work specified in the Schedule and all obligations under this contract within the estimated cost. . . ." This "best efforts" standard applies not only to the question of whether the work was *completed*, but also to whether the work was *performed as specified*. In *United*

---

[71] 48 C.F.R. § 52.232-20.

*Technologies Corp. v. United States*, 27 Fed. Cl. 393, 400 (1992), the court held that, under a cost-reimbursement contract, "it is extremely remote that the contractor would incur any liabilities for defective or untimely work." The Board of Contract Appeals has similarly noted that

> [i]n contrast to a fixed-price contract, [a cost-reimbursement] contract requires only that the contractor use its best efforts to provide the goods or services at the stated price. The contractor is entitled to be paid for its costs of performance, up to the contract ceiling, whether it succeeds in fully performing the contract requirements or not.

*CACI, Inc. v. GSA*, 03-1 BCA ¶ 9852 (2002). *See also N.Y. Shipbuilding Co.*, 73-1 BCA ¶ 9852 (noting that the "costs of producing defective work are normally reimbursable").

### C.    Counts I through IV of Shaw's Complaint

Counts I through IV of Shaw's Complaint depend upon TBE's alleged failure to comply with its obligation to remedy defects under paragraph (g) of the Subcontract's Inspection Clause, FAR 52.246-3 "Inspection of Supplies - Cost Reimbusement," which is referred to in the Complaint as Section E.1(g).[72] There are three provisions of the Inspection Clause that are relevant to Shaw's right to demand correction of the defects alleged in the complaint. The first is FAR 52.246-3(f), under which the subcontractor is required

---

[72] *See* doc. no. 1, Ex. A, at 17; doc. no. 1, ¶¶ 26, 29, 33, 37, and 41.

to replace or correct any supplies that are nonconforming at time of delivery.  Supplies are nonconforming when they are defective in material or workmanship or are otherwise not in conformity with contract requirements.  Except as otherwise provided in paragraph (h), *the cost of replacement or correction shall be included in allowable cost, determined as provided in the Allowable Cost and Payment clause, but no additional fee shall be paid.*  The Contractor shall not tender for acceptance supplies required to be replaced or corrected without disclosing the former requirement for replacement or correction, and, when required, shall disclose the corrective action taken.[73]

The emphasized text provides that, even if supplies are non-conforming or defective, the replacement or correction of these supplies shall be included in TBE's allowable cost.  Put simply, TBE will still be paid to correct previously delivered non-conforming or defective supplies, if there are any.  Under FAR 52.246-3, the only time the buyer is not obligated to pay the contractor its costs of repair is under Paragraph (h), in circumstances where the contractor has not engaged in its best efforts.  Paragraph (h) describes the activities that do not constitute a contractor's best efforts:

Notwithstanding paragraphs (f) and (g), the Government [read "Shaw"] may at any time require the Contractor [read "TBE"] to correct or replace, without cost to the Government, nonconforming supplies, if the nonconformances are due to-

(1) Fraud, lack of good faith, or willful misconduct on the part of the Contractor's managerial personnel; or

(2) The conduct of one or more of the Contractor's employees selected

---

[73] Doc. no. 1, Ex. A, at 17.

21

or retained by the Contractor after any of the Contractor's managerial personnel has reasonable grounds to believe that the employee is habitually careless or unqualified.[74]

Plaintiff's complaint does not allege that TBE's activities constituted fraud, lack of good faith, or willful misconduct, or that any member of TBE's staff is unqualified under FAR 52.246-3. The complaint does not cite paragraph (h) whatsoever. Instead, the complaint relies exclusively on paragraph (g) of the Inspection Clause, which states:

> (g)(1) If the Contractor fails to proceed with reasonable promptness to perform required replacement or correction, the Government may–
>
>      (i) By contract or otherwise, perform the replacement or correction and charge to the contractor any increased cost or make an equitable reduction in any fixed fee paid or payable under the contract;
>
>      (ii) Require delivery of undelivered supplies at an equitable reduction in any fixed fee paid or payable under the contract; or
>
>      (iii) Terminate the contract for default.[75]

Before a contractor can be liable under paragraph (g), the government, or in this case, Shaw, must prove that there was funding on the contract to cover the cost of the replacement or correction. As discussed in greater detail in Section III(B), *supra*, a contractor is under no obligation to take any action or be liable for any

---

[74] *Id.* at 18.

[75] *Id.* at 17-18.

amount under paragraph (g) unless there is funding to cover the costs of performing

a required replacement or correction.  *See* FAR 52.232-20.  In their treatise on the

topic of Cost-Reimbursement Contracts, Professors Nash and Cibinic explain this

concept as follows:

> The contractor is excused from correcting defects when the Government
> refuses to fund beyond the total estimated cost under the [Limitation of
> Cost] or [Limitation of Funds] clauses.  Thus, the Government has the
> contractual right to refuse to accept defective work and to order
> corrective work only if it is willing to provide the money to cover the
> costs of doing the desired remedial work.

John Cibinic, Jr. & Ralph C. Nash, *Cost-Reimbursement Contracting* 1050 (2005).

The Board of Contract Appeals reached the same conclusion in its application of the

Limitation of Cost clause:

> The Government correctly cites the inspection, nonconforming
> supplies and other provisions of the contract as giving the Government
> the right to require the contractor to correct any and all discrepancies
> and deviations from the specifications and drawings.  Unquestionably,
> the Government had the contract right to refuse to accept the tank and
> require the contractor to do corrective work, if, *but only if, the
> Government put up the money to cover the costs of doing the desired
> additional work.  The Government overlooks the principle that, when
> the funds under a cost reimbursement contract have been exhausted, the
> contractor cannot be required to do any additional work under the
> contract unless and until the Government provides the funds to cover the
> costs of doing such additional work.*
>
> When the contracting officer made his determination that 'the
> tank is unacceptable and does not meet minimum contract requirements'
> and ruled that the contractor would be required either to repair the tank

deficiencies or to perform unidentified structural tests to demonstrate the adequacy of the tank, he took a legally untenable position, as *the Government had no legal right to require either repair work or structural tests without providing the funds necessary to pay the costs thereof.* When the Government inspected the tank, it knew that contract funds had been exhausted.  Under such circumstances the Government had the right, at its election, either to accept the tank 'as is' or to add funds needed for the continuation of contract performance and instruct the contractor as to the corrective work desired by the Government.  It did neither.  *The Government had no legal right to require any additional work, corrective or otherwise, on a contract in a cost overrun situation without providing the necessary funds.*

*Appeal of North American Rockwell Corp.*, 72-1 BCA ¶ 9207, Nov. 29, 1971 (emphasis supplied).

Therefore, it is clear as a matter of law that a contractor under a cost-reimbursement contract is obligated to perform corrective work only when funds are available, absent fraud, or similar circumstances enumerated in Paragraph (h).  In this case, the evidence shows, and Shaw does not deny, that TBE performed work for the entirety of the time during which funds were available under the subcontract.  However, once no more money was available on the subcontract to cover TBE's costs, TBE no longer had any obligation to perform any work under the subcontract.  Shaw has not alleged that, on any date that it directed TBE to perform required replacement or correction, there was sufficient funding available under the subcontract.  Moreover, Shaw has not alleged that it provided money to cover the

costs of doing the desired remedial work.

Instead, the evidence shows that, throughout the course of the contract, TBE consistently contacted Shaw to increase the funding on the subcontract in order to permit TBE to continue to work.[76]   In response, Shaw increased the subcontract funding.[77]   As Ms. Varner testified, this pattern continued for the next year, through March of 2008, when Shaw added the last increment of funding to the subcontract.[78] By April 3, 2008, TBE again was out of money on the subcontract.[79]   Ms. Varner informed Shaw that TBE required additional funds to continue work under the subcontract.[80]   On that occasion, however, Shaw did not take any action to add additional funds to the subcontract to cover TBE's costs.[81]   On April 21, 2008, in response to an inquiry from Shaw regarding the temperature limitation of the Fill Machine, TBE reminded Shaw that it was "out of money on the contract [and] need[ed] additional funding prior to initiating any further actions."[82]   Despite TBE's notification, Shaw did not add funds to the subcontract.[83]

---

[76] *See* Declaration of Renee Varner, ¶ 19.

[77] *See id.*, ¶ 22.

[78] *See id.*, ¶ 29.

[79] *See id.*, ¶ 31.

[80] *See id.*

[81] *See id.*, ¶ 32.

[82] *See id.*, ¶ 33.

[83] *See id.*

Defendant TBE urges, and the court finds, that at no time when there was sufficient funding available on the contract for TBE to perform work did Shaw provide notice to TBE under Section E.1(g) of the subcontract that TBE was required to correct or replace the allegedly deficient items.

In its opposition to TBE's motion, Shaw completely ignores the sole reliance of its complaint on paragraph (g), as well as TBE's argument's regarding the requirements of the Limitation of Cost clause. Instead, Shaw relies on language in *Kerner v. Gilt*, 296 So. 2d 428 (La. 4 Cir. 1974), to provide " a standard by which TBE's work will be judged under Louisiana law."[84] The court has already addressed and rejected that argument in Section III(A), *supra*. Tellingly, in an attempt to reconcile its reliance on *Kerner* with the controlling clauses of the FAR, Shaw attempts to draw a parallel between the standard set out in *Kerner*, and the language in FAR 52.246-3**(h)**.[85] The comparison is unpersuasive and irrelevant for numerous reasons. Most significantly, Shaw's complaint relies on paragraph **(g)** to support its claim for recovery, and does not mention paragraph **(h)** whatsoever. Shaw's complaint does not allege that TBE's activities constituted fraud, lack of good faith, or willful misconduct, or that any member of TBE's staff is unqualified. Shaw is

---

[84] Doc. no. 18, at 15.

[85] *See id.* at 19-20.

bound by the allegations in its complaint and cannot raise new claims in its opposition to this motion.

For the foregoing reasons, the court finds that, under the express terms of the subcontract, TBE was under no obligation to correct or replace any of the allegedly defective equipment identified in Counts I-IV of the Complaint. Accordingly, defendant TBE is entitled to summary judgment as to those counts.

**D.    Count V of Shaw's Complaint**

In Count V, Shaw alleges that TBE failed to design and test in accordance with the Subcontract's specifications.[86]  TBE argues that Count V is not cognizable under federal cost-reimbursement contracts generally, or under this subcontract specifically. As discussed above, under a cost-reimbursement contract, the contractor does not guarantee that the specifications will be met, but rather that the contractor will exert its best efforts to do so within the contract's funding.  Shaw has not alleged any violation by TBE of the best efforts standard.  Furthermore, Shaw has not identified any clause in the subcontract that would afford any remedy for deficient design or testing.  To the contrary, Shaw expressly states that "Design and Testing elements of the Subcontract are not 'Supplies' under the Subcontract" and, therefore, are not

---

[86] *See* doc. no. 1, ¶ 43.

within FAR 52.246-3 "Inspection of Supplies - Cost Reimbursement."[87]  Shaw does

not identify any other clause in the subcontract that affords a remedy for deficient

design or testing.  In Shaw's opposition to TBE's motion, Shaw does not address any

of TBE's arguments with respect to Count V.  Therefore, TBE's motion for summary

judgment is due to be granted with respect to Count V as well.

## IV. CONCLUSIONS AND ORDER

For all of the foregoing reasons, defendant's motion for summary judgment is

due to be, and it hereby is, GRANTED.  All of plaintiff's claims are DISMISSED

with prejudice.  Costs are taxed as paid.  The Clerk is directed to close this file.

DONE and ORDERED this 24th day of August, 2010.

_____
United States District Judge

---

[87] *See id.*, ¶ 45.